# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JOSE LUIS BAUTISTA-RAMOS,<br><br>    Defendant. | Case No. 18-CR-4066-LTS<br><br>**REPORT AND RECOMMENDATION** |

Defendant Jose Luis Bautista-Ramos moves to suppress fingerprint evidence and statements he made after he was stopped and arrested by Immigration and Customs Enforcement (ICE) deportation officers. Doc. 7. He primarily argues that ICE officers lacked reason to believe he posed an escape risk and therefore violated 8 U.S.C. § 1357(a) by arresting him without a warrant. He also argues that ICE violated his rights by conducting a traffic stop of his vehicle. The United States (the Government) resists. Doc. 10. I recommend, with some reservation, **denying** the motion to suppress (Doc. 7).

## I.    PROCEDURAL BACKGROUND

On June 26, 2018, ICE officers arrested Bautista-Ramos. He remained in ICE custody for three weeks until I signed a criminal complaint on July 18, 2018, finding probable cause that Bautista-Ramos had unlawfully reentered the United States after previously being removed, in violation of 8 U.S.C. § 1326(a), and issued a warrant for his arrest. MJ Docs. 1, 3.[1] The United States Marshals Service then took Bautista-Ramos into custody following his initial appearance in this court. The grand jury issued

---

[1] "MJ Doc." refers to the docket in the related magistrate case, No. 18-MJ-252 (N.D. Iowa).

an indictment on July 24, 2018, charging Bautista-Ramos with one count of unlawful reentry after removal following an aggravated felony conviction, in violation of 8 U.S.C. § 1326(a) and (b)(2). Doc. 2.

Bautista-Ramos filed a motion to suppress (Doc. 7), and I held a hearing on the motion on September 12, 2018 (Doc. 13). Deportation Officer Corey McMahon testified at the hearing. I also admitted three exhibits submitted by Bautista-Ramos, and seven exhibits submitted by the Government:

- Defendant's Exhibit A (Doc. 7-2) and Government's Exhibit 1 (Doc. 10-1) – Deportation Officer McMahon's report of Bautista-Ramos's June 2018 arrest
- Defendant's Exhibit B (Doc. 7-3) and Government's Exhibit 6 (Doc. 10-6) – ICE form containing Bautista-Ramos's sworn statement with two fingerprints given shortly after his June 2018 arrest
- Defendant's Exhibit C (Doc. 7-4) – ICE form with Bautista-Ramos's fingerprints taken shortly after his June 2018 arrest
- Government's Exhibit 2 (Doc. 10-2) – forms and documents related to Bautista-Ramos's prior removals
- Government's Exhibit 3 (Doc. 10-3) – ICE forms related to the initial investigation of Bautista-Ramos in January 2018, including "leads"
- Government's Exhibit 4 (Doc. 10-4) – ICE forms issued after Bautista-Ramos's June 2018 arrest, including a Notice of Intent to Reinstate Prior Order and Warrant of Deportation
- Government's Exhibit 5 (Doc. 10-5) – Bautista-Ramos's fingerprints and photograph obtained by the U.S Marshals after they took Bautista-Ramos into custody in July 2018
- Government's Exhibit 7 (Doc. 10-7) – documents ICE officers obtained from Bautista-Ramos's employer after his June 2018 arrest.

## II.     BACKGROUND[2]

In January 2018, deportation officers at the local ICE office in Sioux City, Iowa, received "leads" regarding Bautista-Ramos's presence in northwest Iowa from the National Criminal Analysis and Targeting Center. These leads indicated that Bautista-

---

[2] The facts in this section are taken from the testimony offered at the suppression hearing unless otherwise noted.

Ramos's "possible daughter[]" and "possible spouse" (both United States citizens) had activated utilities at an address in Orange City, Iowa, in October and November 2017; that Bautista-Ramos's "possible spouse" owned a restaurant located at an address in Sheldon, Iowa, with an active phone number; and that Osceola County, Iowa, property tax records from 2017/2018 indicated Bautista-Ramos's "possible spouse" owned property in Ashton, Iowa. Doc. 10-3 at 4-6. The leads also indicated that Iowa Secretary of State records revealed Bautista-Ramos was the "co-signer/debtor" for his "possible spouse's" restaurant in Sheldon, Iowa, since the initial filing in 2006 through the most recent filing on December 3, 2017. Doc. 10-3 at 5. There was also an Iowa address for another of Bautista-Ramos's "possible daughters" (also a United States citizen) and the address of a "possible relative." Doc. 10-3 at 6. Through the leads and his own research, Deportation Officer McMahon learned that Bautista-Ramos had previously been removed from the United States in 1985 and again in 1993 (the latter removal as a result of an aggravated felony conviction) and that he had never obtained permission to return to the United States. *See also* Doc. 10-2.

On June 26, 2018, Deportation Officer McMahon and other ICE officers went searching for individuals that they had received leads about, ultimately arresting eleven to fifteen people that day (none pursuant to a warrant). While looking for another individual in Sioux Center, Iowa, an ICE officer received information from a fusion center[3] that Bautista-Ramos worked at JTV Manufacturing in Sutherland, Iowa, and that he drove a sports utility vehicle (SUV) that was dark in color. Deportation Officer

---

[3] "Fusion Centers were developed to promote information sharing between the federal government and state, local, tribal and private sector partners. Fusion Centers use intelligence information from law enforcement, public safety, fire service, emergency response, public health, critical infrastructure protection, and private sector security personnel to prevent, protect against, and respond to crime and terrorism." *United States v. Duenas-Ortiz*, No. CR 14-40007, 2014 WL 5308225, at *1 n.3 (D.S.D. Aug. 12, 2014) (quoting https://dps.sd.gov/homeland_security/fusion_center.aspx), *report and recommendation adopted in part, rejected in part*, 2014 WL 5311524 (D.S.D. Oct. 16, 2014).

McMahon and three other ICE officers went to JTV Manufacturing to investigate. Deportation Officer McMahon stayed on the perimeter road near JTV Manufacturing to stop Bautista-Ramos in case he fled, while other ICE officers went to make contact with Bautista-Ramos.

Deportation Officer McMahon and the other ICE officers knew what Bautista-Ramos looked like through documents from his prior removal proceedings in 1993, which included a picture of Bautista-Ramos (which appears to be from 2001) and a description of his appearance, including height, weight, that he wears glasses, and that he has tattoos on his arms. *See* Doc. 10-3 at 1, 4. Within ten minutes of their arrival at JTV Manufacturing, ICE officers saw an individual, whose appearance matched the picture of Bautista-Ramos, leave the building and walk toward a dark SUV in the parking lot. The ICE officers stopped Bautista-Ramos, "identified who he was verbally by his name," and asked whether he was in the country illegally, to which he responded, yes. ICE officers arrested Bautista-Ramos and took him into ICE custody, where his fingerprints were taken and he made incriminating statements. Later, the United States Marshals took Bautista-Ramos's fingerprints when they took him into custody on the criminal complaint. Doc. 10-5.

There is a factual dispute over the timing of when the ICE officers stopped Bautista-Ramos. The only officer to testify, Deportation Officer McMahon, did not witness officers stopping Bautista-Ramos, although he listened to the encounter via cell phone. He testified that "to [his] knowledge," Bautista-Ramos had opened the door to his vehicle and was standing near it when ICE officers began talking to him. Deportation Officer McMahon's report of the arrest, however, indicates:

> [A deportation officer] observed [Bautista-Ramos] who matched the target[']s description walking toward vehicle. The vehicle was immediately stopped in the parking lot. [ICE officers] approached the vehicle and identified themselves. The vehicle was occupied by one male . . . .

Doc. 7-2 at 2. On cross-examination, he explained that the description in his report is "the information that was provided to [him] at the time of the arrest" by the ICE officers

4

Case 5:18-cr-04066-LTS-KEM   Document 16   Filed 10/15/18   Page 4 of 19

involved in the arrest.  Although I fully credit Deportation Officer McMahon's testimony that he now believes Bautista-Ramos was stopped before he entered his vehicle, no testimony was elicited about how he came to that belief—e.g., did he hear differently from the officers involved in the arrest or from another source? and did he learn this new information prior to or after Bautista-Ramos filed his motion to suppress?[4]  I have no evidence establishing the credibility of Officer McMahon's source for the change in information.  Ultimately, I decline to resolve this factual issue; I will assume that ICE officers stopped Bautista-Ramos's vehicle in the parking lot after he had driven a short ways, because it does not affect my recommendation.

### III. DISCUSSION

Bautista-Ramos moves to suppress the incriminating statements he made after his arrest, as well as the fingerprint evidence obtained by ICE and the United States Marshals.  He argues that ICE officers lacked statutory authority to conduct a traffic stop of his vehicle and to arrest him without a warrant.

#### A. *Traffic Stop*

At the hearing, Bautista-Ramos conceded that prior to stopping his vehicle, the ICE officers had probable cause that he had unlawfully reentered the United States after being removed.[5]  Nevertheless, Bautista-Ramos argues that ICE officers may not conduct

---

[4] In the affidavit filed in support of the complaint on July 18, 2018, Deportation Officer McMahon wrote:
> The [deportation officers] began surveillance in Sutherland, Iowa, and observed defendant, who matched the description the [deportation officers] had, walk towards a vehicle.  The vehicle was immediately stopped in a parking lot. [The deportation officers] approached the vehicle and identified themselves.

MJ Doc. 1 at 3.

[5] As will be discussed further below, I find that at the very least, the ICE officers had probable cause when they saw Bautista-Ramos leaving the building and visually matched his appearance to the photograph included in the "leads" information.

5

Case 5:18-cr-04066-LTS-KEM    Document 16    Filed 10/15/18    Page 5 of 19

a warrantless traffic stop unless they are within one hundred miles of an international border.

Bautista-Ramos relies on 8 U.S.C. § 1357(a)(3), which provides that ICE officers "have power without warrant . . . within a reasonable distance from any external boundary of the United States, to board and search for aliens any . . . vehicle." "Reasonable distance" is defined by regulation as no more than "100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2). Thus, Bautista-Ramos argues that because the ICE officers were more than one hundred miles away from a border, they could not stop his vehicle, despite having probable cause that he had committed a felony immigration offense.

The Government responds that § 1357(a)(3) is inapplicable here and that ICE officers may conduct warrantless traffic stops under 8 U.S.C. § 1357(a)(1), which provides that ICE officers "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States." In *United States v. Brignoni-Ponce*, 422 U.S. 873, 876-77 (1975), the Supreme Court interpreted both § 1357(a)(1) and § 1357(a)(3), which the Government argued permitted ICE officers to conduct traffic stops without meeting the requirements of the Fourth Amendment. The Supreme Court rejected this argument, holding that "[t]he effect of [its] decision is to limit exercise of the authority granted by both [§ 1357(a)(1) and § 1357(a)(3)]," such that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 882, 884. Thus, as I read *Brignoni-Ponce*, the Supreme Court recognized that § 1357(a)(1) permits ICE officers to conduct warrantless traffic stops based on reasonable suspicion and that "[t]here is no geographical limitation on th[e] authority" in § 1357(a)(1). *Id.* at 877, 884; *see also United States v. Tamayo-Baez*, 820 F.3d 308, 311-13 (8th Cir. 2016) (holding that ICE officer had "reasonable suspicion to conduct a traffic stop" of defendant

6

Case 5:18-cr-04066-LTS-KEM    Document 16    Filed 10/15/18    Page 6 of 19

based on information he had illegally reentered the United States and that "therefore the traffic stop was lawful").

Bautista-Ramos's cited authority does not support a different conclusion. In *United States v. Venzor-Castillo*, 991 F.2d 634, 635-36 (10th Cir. 1993), a border patrol agent conducted a traffic stop of a vehicle 235 miles north of the Mexican border based on (1) a recent increase in alien smugglers in the area seeking to avoid a permanent checkpoint located elsewhere; (2) the vehicle being an older model Cadillac, which the agent "often found to be favored by alien smugglers"; (3) the passengers in the back seat sliding down out of view as the vehicle approached the agent's marked patrol car; (4) the passengers in the front seat staring straight ahead as they passed the marked patrol car; and (5) the vehicle appearing to be heavily loaded and having a temporary license plate. The Tenth Circuit suggested that the border patrol agents lacked reasonable suspicion to stop the car because of its distance from the border, noting that "the distance from the border becomes critical when the circumstances will not permit a reasonable presumption the traveler came from beyond the international border" and that in this case, the vehicle could have "entered the highway from any one of the thirteen towns and cities between" the border and the place of the stop, or it could have traveled from a neighboring state. *Id.* at 638-40. The court did not address § 1357(a)(1) or reasonable suspicion based on information obtained from leads. Moreover, even if *Venzor-Castillo* can be read as support for the proposition that ICE officers cannot conduct stops based on reasonable suspicion unless they are within one hundred miles of a border, it distinguishes stops based on probable cause (which Bautista-Ramos concedes existed here). *See id.* at 638.

Bautista-Ramos also relies on the dissenting opinion in *United States v. Orozco*, 191 F.3d 578, 584 (5th Cir. 1999) (Dennis, J., dissenting), which interpreted *Brignoni-Ponce* as limiting "stops on the basis of reasonable suspicion . . . to such stops within the 100 mile border zone." Outside the 100 mile border zone, the dissent suggested, the stop must be based on probable cause. *Id.* at 584-85. Here, probable cause existed, so the *Orozco* dissent does not support that the ICE officers exceeded their statutory

7

authority. Neither does the majority opinion in *Orozco*, which upheld a traffic stop by a border patrol agent that occurred two hundred to three hundred miles from the border based on reasonable suspicion of "illegal alien smugglers" in the vehicle. *Id.* at 579, 581-84

I recommend rejecting Bautista-Ramos's argument that ICE officers lack statutory authority to conduct a traffic stop more than one hundred miles from an international border.[6]

### B. Warrantless Arrest

Bautista-Ramos argues that since ICE officers had no information suggesting he posed an escape risk, they lacked statutory authority to arrest him without a warrant. Under 8 U.S.C. § 1357(a), an ICE officer "ha[s] power without warrant":

> (2) . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest[;] . . .
> (4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest . . . ; and
>   (5) to make arrests—
>     (A) for any offense against the United States, if the offense is committed in the [officer's] presence, or
>     (B) for any felony cognizable under the laws of the United States, if the [officer] has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,
> if the [officer] is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

---

[6] Even if ICE officers exceeded their statutory authority, the exclusionary rule would not apply for the same reasons as discussed *infra* in relation to the likelihood-of-escape requirement.
8

Contrary to the Government's argument otherwise, each of these subsections (including subsection (5)) require belief of a likelihood of escape for an ICE officer to arrest a person without a warrant. *See also* 8 C.F.R. § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."). And consistent with the Fourth Amendment, to arrest a person, an ICE officer must have probable cause that the person is in the United States illegally or has committed an offense. *See United States v. Chavez*, 705 F.3d 381, 384 (8th Cir. 2013).

The Government argues that the arrest was not warrantless due to the prior removal order and warrant of deportation; that ICE officers had reason to believe that Bautista-Ramos would escape; and that even if not, suppression is not an appropriate remedy for a statutory violation. The first of the Government's arguments can be disposed of in short order. The Government argues that the prior removal order and warrant of deportation from Bautista-Ramos's 1993 removal constitutes a warrant for his arrest. *See* Doc. 10-2. The Government points to 8 U.S.C. § 1231(a)(3), which provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

The regulations implementing this provision provide that to "establish[] whether an alien is subject to" reinstatement of a prior removal order, the immigration officer must (1) obtain the prior removal order, (2) determine "whether the alien is in fact an alien who was previously removed . . . ," and (3) determine whether the alien unlawfully reentered the United States; then, once the immigration officer has so found, "he or she shall provide the alien with written notice of his or her determination." 8 C.F.R. § 241.8(a), (b). Thus, certain requirements must be met before the prior removal order

is reinstated; the prior removal order is not "'automatically reinstated by operation of law' upon the [alien's] illegal reentry into the United States." *Lin v. Gonzales*, 473 F.3d 979, 982 (9th Cir. 2007); *see also Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) ("The reinstatement of a prior removal order is neither automatic nor obligatory . . . ."); *Cazun v. Attorney Gen. United States*, 856 F.3d 249, 261 (3d Cir. 2017) ("[R]einstatement of a removal order is not automatic."). Here, the prior removal order and warrant of deportation had not been reinstated at the time of Bautista-Ramos's arrest. Bautista-Ramos's arrest was not pursuant to a warrant. *See Araujo v. United States*, 301 F. Supp. 2d 1095, 1101-02 (N.D. Cal. 2004) (holding that the plaintiff was subject to a warrantless arrest that required a finding he was "likely to escape before a warrant c[ould] be obtained" when ICE could have "file[d] a Notice of Intent/Decision to Reinstate Prior [Deportation] Order," but did not).

Under § 1357(a), a deportation officer has the power to arrest an alien without a warrant only if the deportation officer has reason to believe that the alien is likely to escape before a warrant can be obtained. Bautista-Ramos argues that before the ICE officers stopped Bautista-Ramos in the parking lot, they had no reason to believe that he was likely to escape. The Government does not disagree (indeed, it would be hard for the Government to argue otherwise in the face of a January 2018 form in which an ICE officer indicated that Bautista-Ramos was not a "flight/escape risk" (Doc. 10-3 at 2) and Deportation Officer McMahon's testimony that the circumstances did not change between January 2018 and before the investigatory stop in June 2018). Instead, the Government argues that ICE officers lacked probable cause to arrest Bautista-Ramos until they stopped him and confirmed his identity and status in the United States and that once ICE officers alerted Bautista-Ramos to their investigation by questioning him, Bautista-Ramos posed an escape risk.

The Government relies on *Contreras v. United States*, 672 F.2d 307 (2d Cir. 1982) (per curiam), and *United States v. Ravelo-Rodriguez*, No. 3:11-CR-70, 2012 WL 1597390 (E.D. Tenn. Mar. 12, 2012), *report and recommendation adopted*, 2012 WL

10

1598074 (E.D. Tenn. May 7, 2012). In *Contreras*, ICE officers received an anonymous tip that people living at a certain apartment were in the country illegally. 672 F.2d at 308. They went to investigate, and a woman answered the door in a housecoat and admitted she had entered the country illegally. *Id*. ICE officers arrested her. *Id*. She brought suit under the Federal Tort Claims Act, arguing that ICE officers did not have reason to believe she was likely to escape before a warrant could be obtained for her arrest. *Id*. at 307-09. The Second Circuit held that "when the alien's deportability is clear and undisputed, that circumstance alone may provide a sufficient basis for an [ICE] officer to believe that escape is likely before a warrant can be obtained." *Id*. at 309. Thus, the Second Circuit held that the warrantless arrest was not unlawful, as the alien "acknowledged to the arresting officers that she had entered this country illegally." *Id*. at 309.

*Ravelo-Rodriguez* called the broad language of *Contreras* into question, reasoning (in reliance on an unpublished Fourth Circuit case) that "'a holding that in every case in which an alien is deportable an arrest can be made without a warrant' . . . . would be contrary to the statute itself, which requires a reasonable belief that the alien is likely to escape," in addition to a reasonable belief that the alien is deportable. 2012 WL 1597390, at *16 (quoting *United States v. Harrison*, No. 97-4178, 1999 WL 26921, at *4 (4th Cir. Jan. 25, 1999) (per curiam)).[7] In *Ravelo-Rodriguez*, ICE officers had information that

---

[7] *See also Harrison*, 1999 WL 26921, at *1, *4 (holding that ICE officers did not have reason to believe the defendant was likely to escape when they had received a tip the defendant was in the country illegally, confirmed in their databases that the defendant had previously been removed and never received permission to reenter, and arrested him in a parking lot after confirming his name and that he was from Jamaica); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 937, 946 (D. Minn. 2017) (holding that there was not "any showing that [the defendant] was likely to escape before a warrant could be secured," despite disclosing during the booking process on state-law charges "he was in the country illegally," and that therefore the defendant's continued detention "beyond the time he would have otherwise been released" violated his rights); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 872, 889 (S.D. Ohio 2016) (holding that "ICE officers lacked 'reason to believe' [defendant] posed a risk of escape" even though the defendant admitted during a traffic stop that he "was born in Mexico and did not have any documentation that would allow him to reside in the United States," and his fingerprints

11

the defendant had unlawfully reentered the country after a prior removal and that she was living at a certain address. *Id.* at *1-2. Five or six ICE officers and special agents went to the defendant's residence to take her into custody, although they did not have a warrant. *Id.* at *2. An ICE officer confirmed that a vehicle parked in the driveway was registered to the defendant. *Id.* An ICE officer knocked on a side door to the house, but no one answered, despite blinds "moving inside, with a person looking through them." *Id.* Eventually, ICE officers talked to the defendant's ex-husband, who lived across the street, and he called the defendant and told her that it would best if she surrendered. *Id.* at *3. The defendant exited the residence, and ICE officers arrested her after visually matching her appearance to a photo and questioning her to confirm her identity. *Id.* at *3, *5. The court held that the ICE officers had reason to believe the defendant "would have been likely to escape . . . , given her evasive behavior in failing to answer the door, her knowledge of the agents' purpose and presence, and that she would have known that ICE would be returning to her home to arrest her in the near future." *Id.* at *17.

Here, I do not find that ICE officers had reason to believe that Bautista-Ramos posed a risk of flight at the time of his warrantless arrest.[8] ICE officers determined that

---

revealed he had been "denied an immigration application in 2004 and that there was 'no further paperwork in the system showing that he had any kind of legal status'"), *appeal voluntarily dismissed*, No. 17-3075, 2017 WL 3224180 (6th Cir. Feb. 3, 2017); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) ("Nor can it be the case that, simply by being potentially removable, an alien must be deemed to be likely to evade detention by ICE. Such a reading would render the limitations on warrantless arrest created by . . . [§] 1357(a)(2) meaningless."); *but see Vasquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (relying on *Contreras* and holding that "[g]iven that [the defendant] had admitted that he was not lawfully in the United States," his warrantless arrest after that admission did not violate" the escape requirement of [§] 1357(a)).

[8] I disagree with the Government that ICE officers lacked probable cause until Bautista-Ramos admitted his name and unlawful status—I find that at the very least, ICE officers had probable cause to arrest Bautista-Ramos when they matched his appearance to his photo from his prior removal (and I find it hard to believe that ICE officers would not have arrested Bautista-Ramos if he had given different answers to their questions). Once they visually confirmed Bautista-Ramos's identity, ICE officers could have obtained a warrant for Bautista-Ramos's arrest or reinstated his prior order of removal without letting on to Bautista-Ramos that he was being

12

Bautista-Ramos was not a flight risk in January 2018 (Doc. 10-3 at 2), and the only thing that changed between then and the time of his arrest six months later is that ICE officers confronted Bautista-Ramos about his immigration status. Bautista-Ramos answered their questions truthfully and was not evasive, distinguishing *Ravelo-Rodriguez*. *See also Davila v. United States*, 247 F. Supp. 3d 650, 670 (W.D. Pa. 2017) (suggesting fact that motorist "willingly assisted ICE and the police as an interpreter during their nearly two hour roadside interrogation" of the passenger of her vehicle weighed against a finding that she posed an escape risk).[9] ICE officers encountered Bautista-Ramos at a place he routinely visited (his place of employment), which is not indicative of a likelihood of escape the way that encountering an alien in the midst of a cross-country road trip might be. *See id*. at 669 (suggesting fact that motorist was not "anywhere near the border[] or . . . headed in that direction," but rather, had just "pulled out of a grocery store parking lot after a routine shopping trip" weighed in favor of a finding that she did not pose an escape risk).[10] Unlike cases in which ICE officers do not know an alien's true name or

---

investigated. Nevertheless, I recognize that "law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application" and that courts should not "[f]ault[] the police for failing to apply for a . . . warrant at the earliest possible time after obtaining probable cause." *Kentucky v. King*, 563 U.S. 452, 467 (2011).

[9] *Cf. Duenas-Ortiz*, 2014 WL 5308225, at *1-2, *1 n.4, *8 (holding that there was reason to believe the defendant posed an escape risk "once the defendant admitted" he was the person depicted in the leads who had previously been deported after he had initially denied his true identity and provided an expired Mexican identification card with a false name), *aff'd in relevant part on clear error review*, 2014 WL 5311524, at *8; *United States v. Espinoza-Raya*, No. 4:09CR265, 2009 WL 5214500, at *1, *3 (D. Neb. Dec. 21, 2009) (holding that "[d]espite the defendant's initially cooperative attitude, as evidenced by his returning [an ICE officer's] phone call, there was a likelihood the defendant would escape before a warrant could be obtained" when the defendant admitted to using a nonexistent social security number to open a bank account, which used the same name and date of birth as an alien who had previously been deported, but denied being that alien or having been previously deported).

[10] *Cf. United States v. Quintana*, 623 F.3d 1237, 1238, 1241 (8th Cir. 2010) (ICE officer had reason to believe that defendant was likely to escape when he was stopped for speeding in North Dakota and stated he was traveling from Washington in a relative's vehicle, provided a Mexican driver's license, and stated he was in the country on a visa, but no immigration records existed for a person with the name and date of birth provided); *United States v. Cantu*, 519 F.2d 494,

13

other identifying information (such as *Contreras*), here, there is no indication that ICE officers would have had trouble finding Bautista-Ramos again if they had released him[11] while they obtained a warrant: not only had they confirmed his name and place of employment, but they had leads on his address, his wife's name and her restaurant's address, his two daughters' names and addresses, and another relative's name and address, all located in northwestern Iowa.[12] Doc. 10-3 at 5-6, 8, 11. Moreover, ICE officers had information suggesting that Bautista-Ramos had been present in northwest Iowa since at least 2006, when he first co-signed a loan for his wife's restaurant; he was employed; and his wife and daughters were United States citizens (Doc. 10-3 at 5-6)—supporting that he had strong ties to the community. *See Pearl Meadows Mushroom Farm, Inc. v. Nelson*, 723 F. Supp. 432, 449-50 (N.D. Cal. 1989) (holding that "workers

---

495, 497 (7th Cir. 1975) (holding that "the likelihood of escape was a serious threat" when ICE officers knew that the defendant had traveled from the Mexican border to Illinois over the past two days, despite a corroborated tip indicating the defendant was near her final destination, because the defendant had been "highly mobile," traveling on "a heavily-trafficked interstate highway system at high speeds and for a great distance," and "[f]rom one moment until the next [her] location was uncertain and [her] destination was not entirely predictable").

[11] Indeed, ICE officers could have sought a warrant without first approaching Bautista-Ramos because they were able to confirm he matched the photograph and other identifiers in their file when they saw him walk from his place of employment to his vehicle.

[12] *Cf. Quintana*, 623 F.3d at 1238, 1241; *Ojeda-Vinales v. Immigration & Naturalization Serv.*, 523 F.2d 286, 287-88 (2d Cir. 1975) (per curiam) (cited favorably by the Eighth Circuit in *Quintana*) (ICE officers knew only the alien's first name and place of employment based on an anonymous tip; reason to believe the defendant would escape after he admitted to working on a tourist visa and failed to produce any identification); *United States v. Gomez-De La Cruz*, No. 8:10CR336, 2011 WL 883692, at *9 (D. Neb. Mar. 11, 2011) (ICE officers did not know the alien's true name; they had probable cause she was using a false identity to obtain employment and "could . . . reasonably believe that, once alerted to the fact of a Social Security fraud investigation [at her place of employment], an individual using a stolen Social Security number would not be likely to either remain at or return to her place of employment"); *Hon Keung Kung v. Dist. Dir., Immigration & Naturalization Serv.*, 356 F. Supp. 571, 573, 576 (E.D. Mo. 1973) (ICE officers had no confirmation of the alien's name, place of employment, or residence; they discovered him in a hotel when searching for other people, and he admitted to deserting a ship he had been a crewman on and having no lawful status in the United States).

14

were long-term employees, had roots in the community, and family with proper immigration status" weighed against determining they were likely to escape); *see also United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 872, 890 (S.D. Ohio 2016) (holding that the defendant did not pose an escape risk, even though fingerprint evidence and his admissions confirmed he was in the country unlawfully, when he was arrested during a traffic stop "a few miles from his home" on the way to his "stable job as a painter," "lacked any known criminal history, . . . answered the officers' questions without incident," and "lived with his fiancé" and her children); *Araujo v. United States*, 301 F. Supp. 2d 1095, 1097, 1102 (N.D. Cal. 2004) (holding that the defendant was not likely to escape when he was arrested at the home he shared with his wife, a United States citizen, and had filed an application to adjust his immigration status). Neither did ICE officers have evidence here of "the existence of altered papers, evidence of prior arrests" within the past twenty years, or evidence of past "attempts to flee." *Pearl Meadows Mushroom Farm*, 723 F. Supp. at 449.

"Th[e] flight-risk determination is not mere verbiage." *Pacheco-Alvarez*, 227 F. Supp. 3d at 889 (relying, inter alia, on *Arizona v. United States*, 567 U.S. 387, 408 (2012), which invalidated a state statute authorizing warrantless arrests of removable aliens that did not require a finding of a likelihood of escape); *see also Davila*, 247 F. Supp. 3d at 668 ("The likelihood-of-escape limitation is 'seriously applied.'" (quoting *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975)). When ICE officers arrested Bautista-Ramos without a warrant and without reason to believe he was likely to escape before a warrant could be obtained, they exceeded their statutory authority and violated § 1357(a). To hold otherwise would be to render the "likelihood of the person escaping" clause of the statute meaningless, satisfied any time ICE officers alert an undocumented alien to their investigation (which could occur in every case, even those in which ICE officers already had probable cause, as here, and allow ICE officers to circumvent the statutory warrant requirement simply by confronting the alien about his immigration status before arresting him).

I am troubled by what appears to be a practice of effecting warrantless arrests without regard to the requirements of § 1357(a).[13] Unlike other federal law enforcement officers who can make warrantless arrests without the restriction of risk of escape (including the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Federal Bureau of Investigation, United States Marshals, and the United States Secret Service), Congress specifically limited deportation officers' authority to make warrantless arrests to situations where arrestees pose a risk of escape. *Compare* 8 U.S.C. § 1357, *with* 18 U.S.C. §§ 3051(a), 3052, 3053, 3056(c)(1)(C). It would seem that this statutory constraint would help determine whether a warrantless arrest is reasonable under the Fourth Amendment, but I have found no support for this position. *See United States v. Ryan*, 731 F.3d 66, 69 (1st Cir. 2013) (finding that *Virginia v. Moore*, 553 U.S. 164 (2008) "suggests that neither federal nor state statutes affect whether a seizure is unreasonable under the Fourth Amendment" and holding "that an arrest supported by probable cause is constitutionally reasonable . . . without implying an exception for an arrest in violation of a federal statute"). I am further concerned by the lack of remedies available to persons arrested by deportation officers in violation of § 1357(a). Although most persons arrested illegally may seek redress through civil lawsuits, it would seem that nearly all aliens arrested in violation of § 1357(a) are removed from this country (usually in fairly short order) and therefore are unable to file civil actions to address their unlawful arrests.

Despite my concerns, Bautista-Ramos cites no cases (and I have found none) holding that suppression is an appropriate remedy here. Bautista-Ramos does not dispute that the ICE officers had probable cause that he had committed the felony offense of reentry after prior removal. As a general rule, the Fourth Amendment requires that a warrantless arrest be based on probable cause but does not require the arresting officer

---

[13] Deportation Officer McMahon testified that ICE officers arrested eleven to fifteen people on the same day as Bautista-Ramos as the result of investigating leads, none pursuant to a warrant. It seems the day was planned with the intent to arrest the people subject to leads.

believe the person is likely to escape before a warrant can be obtained.  *See United States v. Watson*, 423 U.S. 411, 423-24 (1976); *Cantu*, 519 F.2d at 496 & n.3.  Rather, the likelihood of escape "is a statutory limitation."  *Cantu*, 519 F.2d at 496.

> [T]here is no exclusionary rule generally applicable to statutory violations.  Rather, the exclusionary rule is an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy or the statutory violation implicates underlying constitutional rights such as the right to be free from unreasonable search and seizure.

*United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006).  Although it could perhaps be argued that ICE officers that exceed their statutory authority and make an arrest outside their jurisdiction have effected an unreasonable seizure in violation of the Fourth Amendment (even if they have probable cause to make an arrest), every court to address this issue (that I have found) has rejected this argument, or at least, held suppression is not warranted.  *See United States v. De La Cruz*, 835 F.3d 1, 5-7, 6 n.4 (1st Cir. 2016) (holding that when ICE officers "exceeded their federal statutory mandate" by arresting the defendant without a warrant—and without reason to believe he was likely to escape— only a statutory violation occurred, not a constitutional violation, as ICE officers had probable cause the defendant had committed aggravated identity theft and related offenses, and the "statutory violation 'untethered to the abridgment of constitutional rights' [wa]s insufficient to justify suppression" (quoting *United States v. Adams*, 740 F.3d 40, 43 (1st Cir. 2014))); *Abdi*, 463 F.3d at 554, 558, 560 (holding that when ICE officers violated § 1357(a) by effecting a warrantless arrest without a belief the defendant would escape, the exclusionary rule did not apply because "no violation of the Fourth Amendment resulted from the warrantless arrest," as ICE officers had probable cause the defendant had committed a terrorism-related felony); *Harrison*, 1999 WL 26921, at *4-5 (holding that when ICE officers arrested the defendant with probable cause of unlawful reentry but no belief related to a likelihood of escape, they violated § 1357(a), but not the Fourth Amendment; and declining to address as a general matter whether "the exclusionary rule applies to evidence obtained after an arrest that is illegal but not

unconstitutional," and holding that "inherently reliable" identity evidence such as fingerprints should not be suppressed to remedy a violation of the § 1357(a) escape requirement); *see also United States v. Ryan*, 731 F.3d 66, 66-71 (1st Cir. 2013) (holding that although federal park ranger lacked statutory authority to arrest the defendant outside the park system, the arrest was "constitutionally reasonable" and suppression was not an appropriate remedy); *United States v. Perkins*, 166 F. Supp. 2d 1116, 1132-33 (W.D. Tex. 2001) (holding that when border patrol agents exceeded their statutory authority by stopping a vehicle based on reasonable suspicion of drug trafficking, suppression was not an appropriate remedy, even though "the limitations on the arrest powers of . . . any . . . specialized federal law enforcement agency[] implicate constitutional rights"), *on reconsideration*, 177 F. Supp. 2d 570 (W.D. Tex. 2001) (holding no statutory violation occurred and thus not addressing remedy), *aff'd*, 352 F.3d 198 (5th Cir. 2003). Accordingly, I recommend denying Bautista-Ramos's motion to suppress.[14]

## IV.   CONCLUSION

I RESPECTFULLY RECOMMEND that Bautista-Ramos's motion to suppress (Doc. 7) be **denied**.

---

[14] I note that the outcome would be different if the arrest were based solely on § 1357(a), as is the case for arrests of unlawful aliens that have not committed any crime. *See Abdi*, 463 F.3d at 557 n.13; *id.* at 568 (Cole, J., dissenting); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890-93. In addition, if deportation officers continue to violate § 1357(a) in making warrantless arrests, I would not hesitate to recommend that the district court suppress evidence. *See United States v. Dreyer*, 804 F.3d 1266, 1275, 1280-81 (9th Cir. 2015) (holding that suppression was not warranted where a Naval Criminal Investigative Service agent violated a statutory prohibition on conducting civilian law enforcement activities, even though the violation was "systematic," because it appeared to be "the result of institutional confusion," rather than an "intentional disregard of a statutory constraint"; the court held that the government "should have the opportunity to self-correct before [the court] resort[s] to the exclusionary rule"); *Ryan*, 731 F.3d at 70 n.4, 71 n.5 (noting in footnotes that the court was "not consider[ing] whether suppression would be appropriate if [the federal park ranger] were acting in circumstances wholly divorced from his authority (for example, by arresting someone while on vacation in another state)" and that the Seventh Circuit had suggested "that the result might have been different if the arresting officers had known that they lacked jurisdiction").

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED** this 15th day of October, 2018.

*[signature: Kelly K.E. Mahoney]*

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa